**In re Jeffery ECKERT, Debtor.**

**David E. Grochocinski, Chapter 7 Trustee, Plaintiff,**

v.

**David Schlossberg, Gary Laliberte, Christine Eckert, and Marcelo Carlos, Defendants.**

**Bankruptcy No. 05 B 54618.
Adversary No. 07 A 00450.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 3, 2008.

Jane D. Yanovsky, Neal H. Levin, Freeborn & Peters LLP, Chicago, IL, for Plaintiff.

Mazyar M. Hedayat, M. Hedayat & Associates, Bolingbrook, IL, for Defendants.

## *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the amended complaint filed by David E. Grochocinski, the Chapter 7 case trustee (the "Trustee") of the bankruptcy estate of Jeffery Eckert (the "Debtor") against David Schlossberg ("Schlossberg"), Gary Laliberte ("Laliberte"), Christine Eckert ("Christine")[1], and Marcelo Carlos ("Carlos") (collectively the "Defendants") that seeks to avoid alleged fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1) and 740 ILL. COMP. STAT. 160/5 and 160/6. The matter involves the transfers of two parcels of real property that the Debtor

allegedly orchestrated to hinder, delay, and defraud his creditors with the assistance and knowing participation of the Defendants.

For the reasons set forth herein, the Court grants judgment in favor of the Trustee and against Schlossberg pursuant to Count 1 of the amended complaint. The Court finds that the transfer of the Debtor's interest in real property located at 2072 Tunbridge Trail, Algonquin, Illinois to Schlossberg was a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A) and (B). As such, the transfer is avoidable under 11 U.S.C. § 544(b)(1). Under 11 U.S.C. § 550(a)(1), the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sum of $109,000 for the fraudulent transfer of this real property, which represents the value of the Debtor's interest in that property received by Schlossberg.

In addition, the Court grants judgment in favor of the Trustee and against Schlossberg pursuant to Count II of the amended complaint. The Court finds that the transfers of the Debtor's interests in real property located at 1073 Union Court, Bartlett, Illinois and 2072 Tunbridge Trail, Algonquin, Illinois to Schlossberg were fraudulent conveyances under 740 ILL. COMP. STAT. 160/5(a)(1) and (2) and 160/6(a). As such, the transfers are avoidable under 11 U.S.C. § 544(b)(1) and 740 ILL. COMP. STAT. 160/8(a)(1). Pursuant to 11 U.S.C. § 550(a)(1) and 740 ILL. COMP. STAT. 160/9(b), the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sums of $120,000 and $52,357.54 for the fraudulent transfer of the first property and $109,000 for the fraudulent transfer of the second property, which represent the

---

1. As discussed in detail *infra,* the Court entered an amended default judgment against Christine and in favor of the Trustee. Thus, Count VII of the amended complaint, which seeks relief against Christine, has been disposed of and will not be further addressed in this Opinion.

value of the Debtor's interests in those properties received by Schlossberg. Under 11 U.S.C. § 550(d), the Trustee is limited to only a single satisfaction from Schlossberg pursuant to Counts I and II of the amended complaint.

With respect to Count III of the amended complaint, the Court grants judgment in favor of Laliberte and against the Trustee. The Court finds that the July 2003 transfer of the Debtor's interest in real property located at 1073 Union Court, Bartlett, Illinois to Laliberte was not made on or within two years before the date of the Debtor's bankruptcy filing under 11 U.S.C. § 548(a)(1)(A) and (B).

Under Count IV of the amended complaint, the Court grants judgment in favor of the Trustee and against Laliberte. The Court finds that the transfer of the Debtor's interest in real property located at 1073 Union Court, Bartlett, Illinois was a fraudulent conveyance under 740 ILL. COMP. STAT. 160/5(a)(1) and (2) and 160/6(a). As such, the transfer is avoidable under 11 U.S.C. § 544(b)(1) and 740 ILL. COMP. STAT. 160/8(a)(1). Pursuant to 11 U.S.C. § 550(a)(1) and 740 ILL. COMP. STAT. 160/9(b), the Trustee may recover from Laliberte, for the benefit of the Debtor's estate, the sums of $120,000 and $52357.54, which represent the value of the Debtor's interest in that property received by Laliberte.

With respect to Count V of the amended complaint, the Court enters judgment in favor of the Trustee and against Carlos. The Court finds that the transfer to Carlos of the Debtor's interest in real property located at 1073 Union Court, Bartlett, Illinois was a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A) and (B). As such, the transfer is avoidable under 11 U.S.C. § 544(b)(1). Pursuant to 11 U.S.C. § 550(a)(2), the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the sale of the real property.

Finally, the Court grants judgment in favor of the Trustee and against Carlos pursuant to Count VI of the amended complaint. The Court finds that the transfer of the real property located at 1073 Union Court, Bartlett, Illinois to Carlos was also a fraudulent conveyance under 740 ILL. COMP. STAT. 160/5(a)(1) and (2) and 160/6(a). As such, the transfer is avoidable under 11 U.S.C. § 544(b)(1) and 740 ILL. COMP. STAT. 160/8(a)(1). Pursuant to 11 U.S.C. § 550(a)(2) and 740 ILL. COMP. STAT. 160/9(b)(2), the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the sale of the real property. Under 11 U.S.C. § 550(d), the Trustee is entitled to only a single satisfaction from Carlos pursuant to Counts V and VI of the amended complaint.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

## II. FACTS AND BACKGROUND

Most of the facts and background are undisputed. The Debtor filed a voluntary Chapter 7 bankruptcy petition on October 14, 2005. Thereafter, the Trustee was appointed in the underlying bankruptcy case. The Trustee is the plaintiff in the instant adversary proceeding.

## A. The Union Court Property Transfers

On August 4, 2002, the Debtor entered into a sales contract with Bartlett One L.L.C. for the construction of a new home at 1073 Union Court, Bartlett, Illinois (the "Union Court Property"), (Trustee Ex. No. 6.) Over the next twelve months, prior to the completion of the house, the Debtor made cash payments pursuant to the sales contract totaling $120,000 against the adjusted purchase price of $804,674.50. (Trustee Ex. Nos. 7, 17, & 62 at 49:6–49:19.) By the lime the house was finished, however, the Debtor had been experiencing financial difficulties. The Debtor testified that despite repeated attempts, he was unable to obtain a mortgage on the Union Court Property to pay the balance due on the construction contract.

### 1. July 2003 Sale of the Union Court Property to Schlossberg and Laliberte

On July 8, 2003, two business associates of the Debtor, Schlossberg and Laliberte, entered into a partnership agreement whereby they agreed to purchase the Union Court Property for the purpose of reselling such Property to the Debtor under a contract for deed. (Trustee Ex. Nos. 13, 62 at 50:12–51:9, & 66 at 52:6–52:19.) Pursuant to the unwritten portion of the agreement, Schlossberg and Laliberte would purchase the Union Court Property and apply the $120,000 down payment provided by the Debtor, and would secure a mortgage for the balance of the purchase price, which would be paid on a monthly basis by the Debtor. (Trustee Ex. Nos. 16, 18, 19, 20, 21, 62 at 51:13–51:20, & 66 at 54:6–54:13.) Only Schlossberg and Laliberte, however, would be listed as purchasers on the deed. As an inducement to Schlossberg and Laliberte to purchase the Union Court Property with the intention to resell it to the Debtor, the Debtor agreed to pay a premium on the underlying obligation undertaken by Schlossberg and Laliberte. This premium was paid monthly, over and above the mortgage obligation, and created a "spread" that would amount to Schlossberg and Laliberte's profit on the transaction. (Trustee Ex. Nos. 62 at 51:13–51:20 & 65 at 13:1–13:20.)

On July 23, 2003, the closing date of the sale of the Union Court Property, Schlossberg, Laliberte, and the Debtor signed an assignment of real estate contract wherein the Debtor assigned to Schlossberg and Laliberte his interest in the Union Court Property in exchange for entering into articles of agreement for deed. (Trustee Ex. No. 16.) The articles of agreement for deed provided that the Debtor could repurchase the Union Court Property from Schlossberg and Laliberte if he made monthly payments to Schlossberg and Laliberte and a final balloon payment due on an unspecified date. (Trustee Ex. No. 19.) The contract for deed also preserved the Debtor's $120,000 equity in the Union Court Property. (*Id.*) At the closing, Schlossberg and Laliberte purchased the Union Court Property using the equity invested by the Debtor and two mortgages that they obtained from American Chartered Bank, (Trustee Ex. Nos. 17, 21, & 22.) Schlossberg and Laliberte were the only parties named as purchasers on the warranty deed issued by the seller, Bartlett One L.L.C. (Trustee Ex. No. 20.) The Debtor's name did not appear on the deed, despite his continuing equity interest in the Union Court Property. (*Id.*) This sum of $120,000 is part of the focus of Counts I and II against Schlossberg and Counts III and IV against Laliberte.

Following the closing of the Union Court Property sale and pursuant to the articles of agreement for deed, the Debtor made

the monthly mortgage payments whereby the Debtor paid Schlossberg and Laliberte who in turn paid American Chartered Bank less the "spread." (Trustee Ex. No. 65 at 14:15–14:24.) The Debtor, Christine, and their children resided in the house on the Union Court Property at all relevant times to this transaction. (Trustee Ex. Nos. 3 ¶ 58 & 62 at 47:23–48:8.)

In a February 10, 2004 e-mail correspondence to Schlossberg, the Debtor acknowledged that he entered into the agreement with Schlossberg and Laliberte in order to hinder, delay, and defraud his creditors. (Trustee Ex. Nos. 23, 62 at 55:1–59:18, & 66 at 93:1–93:7.) Specifically, the Debtor wrote, "[t]his contract for deed is a great way to protect my assests [sic] since I trust you and you hold title I am asset free almost ... i.e. 'why sue Jeff, he aint [sic] got nothin!' [sic] ... I like the idea of keeping my house safe." (Trustee Ex. No. 23.) Several months later, on June 23, 2004, the Debtor sent another e-mail correspondence to Schlossberg to confirm "the deal with asset protection in mind...." (Trustee Ex. No. 25.)

In July of 2004, Schlossberg and Laliberte refinanced the mortgage on the Union Court Property. On July 7, 2004, the Debtor, Schlossberg, and Laliberte executed a modification agreement that retained the structure of their previous arrangement under the articles of agreement for deed and extended the agreement for another year. (Trustee Ex. Nos. 26 & 65 at 117:23–118:18.) During and following the refinancing, the Debtor exercised control over the Union Court Property and resided therein with his family. (Trustee Ex. No. 62 at 62:23–63:1.) Thereafter, he subsequently entered into a lease and option to buy the Union Court Property with Schlossberg and Laliberte. (Trustee Ex. No. 28.)

### a. The Debtor's Indebtedness to Gregory Steiner and AgriStar Frozen Foods, Inc. and His Financial Problems Worsen

On November 13, 2003, the Debtor and Gregory Steiner ("Steiner") entered into an agreement whereby Steiner committed to form a new entity, AgriStar Frozen Foods, Inc. ("AgriStar"), to act as the sales, marketing, and invoicing arm of a joint venture, while the Debtor's company, Platinum Frozen Foods, Inc. ("Platinum"), promised to perform all actions in connection with the actual repackaging, shipping, and transportation of frozen fruits and vegetables. (Trustee Ex. No. 27 ¶¶ 11 & 12 & Ex. A.) AgriStar was to realize a profit of $0.01/pound of frozen vegetables packed. (*Id.*) At the time this agreement was entered into, however, the Debtor knew that Platinum would not be able to live up to its obligation under that agreement. Despite this fact, the Debtor represented to Steiner that Platinum was a solvent operation, capable of carrying out its obligations under the agreement. The Debtor testified that he did not invest any of his own money in Platinum because he did not have any money to invest. The Debtor further testified that at the time he entered into the agreement with Steiner, a judgment in favor of Peterson Farms had been entered against him personally.

Steiner and AgriStar commenced a lawsuit against Platinum and the Debtor in 2004. (Trustee Ex. No. 27.) According to the amended complaint, the Debtor repeatedly failed to fulfill the terms of the agreement with Steiner and he engaged in numerous bad-faith acts, including fraud, forgery, and misappropriation of AgriStar's money. (*Id.*) As a result, AgriStar was forced to pay all of the expenses related to the joint venture, including the wages, rent, and other costs of operation,

which should have been paid by Platinum. (Trustee Ex. No. 82.)

The Debtor experienced insolvency as far back as 2003 and endured numerous judgments, liens, foreclosures, and other financial difficulties related to Platinum and other ventures. (Trustee Ex. No. 50, Amended Statement of Financial Affairs.) The Debtor owed payroll taxes from Platinum to the Internal Revenue Service for the period of 2003–2004 in the sum of $140,000. (Trustee Ex. No. 50, Amended Schedule E.) In addition, the Debtor owed "941 estimated taxes" in the amount of $250,000 for the period of 2002–2004. (*Id.*) Further, he owed child support in the sum of $120,000 from 2000–2005 to Christine. (*Id.*)

In 2004, the United States Department of Agriculture filed an administrative action against Platinum for violations of the Perishable Agricultural Commodities Act ("PACA"). (Trustee Ex. No. 74.) The action alleged that Platinum failed to pay several sellers approximately $607,800 for perishable agricultural commodities purchased during the period of November 2002 through November 2003. (*Id.*) Moreover, in 2005, Platinum was cited for willful, repeated, and flagrant violations of PACA. (Trustee Ex. No. 73.) The Debtor testified that as the administrator of the PACA license for Platinum, he knew that he was personally liable for any PACA violation. The Debtor's financial situation weakened as time went on, which led to his bankruptcy filing in October of 2005.

The Debtor knew at all relevant times that Platinum was incapable of performing the tasks for which it contracted with Steiner and AgriStar. As a result, the Debtor and Platinum incurred debts to Steiner and AgriStar beyond the Debtor's ability to pay. After an initial investment paid to the Debtor in the amount of $500,000, AgriStar was forced to cover an additional $500,000 worth of expenses caused by Platinum's breach of the agreement and by the Debtor's embezzlement and fraudulent transfer of funds out of AgriStar's account. (Trustee Ex. Nos. 27 & 82.) Hence, at the time the Debtor transferred his interest in the Union Court Property to Schlossberg and Laliberte, the Debtor knew or reasonably should have known that he was about to incur debts beyond his ability to pay, and that his assets remaining after the transfer were unreasonably small to satisfy such debts.

### 2. June 2005 Sale of the Union Court Property to Carlos By Schlossberg and Laliberte

After the Debtor's initial transfer of the Union Court Property to Schlossberg and Laliberte, the Debtor consistently fell behind in his payments to them. (Trustee Ex. Nos. 3 ¶ 44, 63 at 235:15–235:18 & 65 at 122:13–123:11.) The parties eventually agreed that the articles of agreement for deed arrangement was not working. (Trustee Ex. No. 3 ¶ 45.) As a result, the Debtor found another purchaser for the Union Court Property—Carlos. (Trustee Ex. Nos. 63 at 235:15–236:5 & 65 at 149:2–149:4.) Carlos purchased the Union Court Property from Schlossberg and Laliberte for $920,000. (Trustee Ex. No. 32.)

Prior to the June 8, 2005 transfer of the Union Court Property from Schlossberg and Laliberte to Carlos, the Debtor assigned his right, title, and interest in the option to purchase the Union Court Property to Christine, his then live-in girlfriend and now wife, in consideration for alleged outstanding child support payments. (Trustee Ex. Nos. 28, 62 at 65:20–66:12, & 63 at 238:2–238; 18.) As a result, the Debtor received nothing in value from Christine in exchange for the transfer of his equity interest in the Union Court Property to her. (Trustee Ex. No. 63 at

238:19–239:2.) In addition, the Debtor admitted at trial that he forged Christine's signature on the documents allegedly signed by Christine, On June 8, 2005, at the Debtor's direction, Christine then signed a release of option contract between herself and Schlossberg and Laliberte to free the title of the Union Court Property for sale. (Trustee Ex. Nos. 30, 65 at 162:14–162:21, & 61 at 146:2–147:14)

The documents at the June 8, 2005 closing of the Union Court Property sale from Schlossberg and Laliberte to Carlos indicated that the net proceeds of the sale totaled approximately $200,000, which included a payment of approximately $18,000 to Christine. (Trustee Ex. No. 31.) However, none of the payments made at the closing went to the Debtor directly because of his agreement with Schlossberg, Laliberte, Carlos, and Christine.

Carlos, who did not have any funds of his own to purchase the Union Court Property, received $76,207 from the proceeds of the sale of the Property. Specifically, the money changed hands at the June 8, 2005 closing for the sale from Schlossberg and Laliberte to Carlos as follows: the Metropolitan Title Company issued a check for $76,207 to Schlossberg and Laliberte who thereafter endorsed it to Christine. (Trustee Ex. No. 36.) Christine subsequently endorsed the check to Carlos. (Trustee Ex. Nos. 36, 59 at 50:14–51:7, 61 at 148:14–149:19, & 63 at 310:6–311:16.) The payment of this sum to Carlos is the focus of Counts V and VI against him. On June 7, 2005, one day before the Union Court Property closing, Christine received a check from MidAmerica Bank marked "Re Gary Laliberte" for $53,000. (Trustee Ex. No. 37.) Christine also endorsed this check to Carlos, This amount was ultimately paid to Laliberte as repayment for a loan he obtained from a third party in order to close the deal. This sum is not sought by the Trustee. The remaining $52,357.54 of the $200,000 proceeds from the sale of the Union Court Property was paid to Schlossberg and Laliberte. (Trustee Ex. Nos. 30 & 31.) This sum of $52,357.54 is part of the focus of Counts I, II, III, and IV against Schlossberg and Laliberte.

All of the money received by Carlos came directly out of the investment of the Debtor at the time of the sale of the Union Court Property. (Trustee Ex. No. 62 at 77:9–77:23.) However, the Debtor did not receive anything equivalent in value in exchange for transferring to Carlos his interest in the $76,207. Moreover, Schlossberg, Laliberte, and Christine also received payments out of the equity to which the Debtor was concealing pursuant to the Debtor's arrangement with all three of them. (Trustee Ex. No. 65 at 158:12–159:17.) Thus, the net effect of the Debtor's transactions is such that he procured the sale and resale of the Union Court Property through two sets of purchasers who shielded his investment and interest in that Property from his creditors. This distribution of his interest, which was concealed through the above payments to Schlossberg, Laliberte, Carlos, and Christine, was without consideration paid by them for his equity. In the meantime, the Debtor remained in possession of the Union Court Property from the June 2005 closing until he once again stopped making his rent/mortgage payments to Carlos and moved out of the Union Court Property in the fall of 2005. (Trustee Ex. Nos. 34 & 65 at 150:4–150:10.)

### B. The Tunbridge Property Transactions

In November of 2004, the Debtor unsuccessfully attempted to sell another asset, 2072 Tunbridge Trail, Algonquin, Illinois (the "Tunbridge Property") for $429,000.

(Trustee Ex. Nos. 54–57.) On December 31, 2004, the Tunbridge Property was appraised with a value of $420,000, (Trustee Ex. No. 58.) Shortly thereafter, the Debtor and Schlossberg devised a plan with respect to the Tunbridge Property. On January 19, 2005, the Debtor sold the Tunbridge Property to Schlossberg for $325,000, which was $95,000 less than its appraised value at the time. (Trustee Ex. Nos. 38–41 & 53.) The Debtor and/or Schlossberg convinced the mortgagee to accept less than the balance so as to avoid any cloud on the title.[2] The Debtor did not receive anything in value for the bargain-priced transfer of the Tunbridge Property to Schlossberg. (Trustee Ex. No. 38.)

Less than one year later, on December 9, 2005, Schlossberg resold the Tunbridge Property for $455,000, which resulted in a profit to him of $130,000. (Trustee Ex. No. 43.) The Debtor admitted that he sold the Tunbridge Property to Schlossberg below market price and that he subsequently received a forty percent portion of the profit for his participation in the transaction, (Trustee Ex. Nos. 35, 48, 49, 62 at 138:1–139:9, & 66 at 27:2–28:8.) Schlossberg received at least sixty percent of the $130,000 profit that he and the Debtor made as a result of their plan to sell the Tunbridge Property to Schlossberg below market price who, in turn, sold it at a profit.

## C. The Instant Litigation

On May 24, 2007, the Trustee filed a complaint commencing this adversary proceeding to avoid and recover the Debtor's alleged fraudulent transfers of the Union Court Property and the Tunbridge Proper-

ty and for related relief. (Trustee Ex. No. 1.) The Trustee filed an amended complaint on August 24, 2007. (Trustee Ex. No. 2.) In the amended complaint, the Trustee requested alternative relief by way of attachment, imposing constructive trusts against Schlossberg, Laliberte, and Carlos, injunctive relief, or the appointment of a receiver for their alleged ill-gotten gains. No evidence in support of or action was taken by the Trustee relative to these alternative remedies. As a result, this relief will not be further discussed here, save to note that 11 U.S.C. § 105(b) prohibits the Court from appointing a receiver in a case under title 11.

Schlossberg, Laliberte, and Carlos filed an answer to the amended complaint on September 7, 2007, (Trustee Ex. No. 3.) Christine did not answer the amended complaint. As a result, on October 24, 2007, the Court entered an order of default judgment in the sum of $275,921.53 against Christine. (Trustee Ex. No. 4.) On November 9, 2007, the Court entered an amended order of default judgment against Christine in the sum of $281,112.99. (Trustee Ex. No. 5.)

On April 14, 2008, a trial was held in this matter on Counts I through VI. Prior to the commencement of the hearing, the Court granted the Trustee's motion to compel and for sanctions against Schlossberg.[3] Specifically, the Court sanctioned Schlossberg for intentional spoliation of relevant and other electronic data from his computers in violation of the Court's protective order. (Trustee Ex. No. 70.) As a sanction for his actions, the facts as alleged by the Trustee relating to Schlossberg were taken as proof against him. Further, Schlossberg was prohibited from

---

2. The Trustee does not seek recovery of the amount paid to the mortgagee.

3. The Court orally granted the Trustee's motion at the April 14, 2008 trial and the order evidencing that ruling was submitted and signed one day later on April 15, 2008.

introducing testimony or other evidence in opposition to those facts.

## III. DISCUSSION

### A. Count I: 11 U.S.C. §§ 548(a) and 550(a)

Pursuant to Count I of the complaint, the Trustee alleges that within two years of the filing of his bankruptcy petition, the Debtor transferred his interests in the Union Court Property and the Tunbridge Property to Schlossberg with the actual intent to delay, hinder, and defraud his creditors. The Trustee asserts that the February 10, 2004 e-mail and subsequent correspondence from the Debtor to Schlossberg indicate that the Debtor entered into the Union Court Property transaction in order to transfer his interest therein with the actual intent to hinder and defraud his creditors. The Debtor allegedly retained possession and control of the Union Court Property while concealing his real interest in that asset. Further, the Trustee avers that the Debtor admitted that he received a kickback from Schlossberg on the sale of the Tunbridge Property. The Trustee alleges that as the Debtor's friend and close business associate, Schlossberg was an insider for purposes of the transfers under 11 U.S.C. § 101(31)(A). According to the Trustee, the transfers of the Union Court Property and the Tunbridge Property constituted conveyances of substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of his debts exceeded all of his assets. The Trustee seeks a finding that the transfers of the Union Court Property and the Tunbridge Property from the Debtor to Schlossberg were fraudulent under 11 U.S.C. § 548(a)(1)(A), (a)(1)(B)(ii)(I), (a)(1)(B)(ii)(III), and (a)(1)(B)(ii)(IV). Further, he requests the return of these estate assets or, in the alternative, a judgment in his favor for the benefit of the estate equal to the value of the property transferred under 11 U.S.C. § 550. Pursuant to the sanctions levied by the Court against Schlossberg for his intentional spoliation of electronic data from his computers, the facts alleged by the Trustee are taken as proof against him.

■ "Section 548 of the Bankruptcy Code enables a trustee to avoid certain pre-petition transfers of property on the ground that the transfers were fraudulent." *Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 642 (Bankr.N.D.Ill. 2006). "Fraudulent conveyance law protects creditors from last-minute diminutions of the pool of assets in which they have interests." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir.1988). Section 548(a)(1) of the Bankruptcy Code provides as follows:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about, to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

■ A cause of action under § 548(a)(1)(A) is commonly referred to as "actual fraud" because of the element of the debtor's actual intention to hinder, delay, or defraud creditors. *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996). A cause of action under § 548(a)(1)(B), on the other hand, is often referred to as "constructive fraud" because it omits any element of intent.[4] *Id.* One decision has described the differences between the two causes of action under § 548(a)(1):

The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency [is] required. Culpability on the part of the ... transferees is not essential.

Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not. material to the question whether the transfer is ac-

tually fraudulent.... Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.

*Plotkin v. Pomona Valley Imps., Inc. (In re Cohen)*, 199 B.R. 709, 716–17 (9th Cir. BAP 1996). Thus, the intent of the transferee is immaterial.

■ The trustee has the burden of proving a fraudulent transfer under § 548. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 (Bankr. N.D.Ill.2005). Here, the Trustee has specifically alleged actual fraud under § 548(a)(1)(A) and constructive fraud under § 548(a)(1)(B) in his amended complaint. Hence, the Court must address both theories.

■ Under § 548(a)(1)(A), a transfer can be fraudulent if it was made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). Because there is rarely direct evidence of the intent underlying a transfer of property, courts look to circumstantial evidence, referred to as the badges of fraud, in determining whether a transfer was intended to hinder, delay, or defraud creditors, *Carmel v. River Bank Am. (In re FBN Food Servs., Inc.)*, 185 B.R. 265, 275 (N.D.Ill. 1995), *aff'd*, 82 F.3d 1387 (7th Cir.1996). Those badges of fraud include the following: (1) absconding with the proceeds of the transfer immediately after their receipt; (2) absence of consideration when the transferor and transferee know that

---

**4.** *The FBN Food Servs.* case references § 548(a)(2). Section 548(a)(1)(B)(i)-(ii) was formerly designated as § 548(a)(2)(A)-(B) before amendment by the Religious Liberty and

Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, effective for cases pending or commenced on or after June 19, 1998.

outstanding creditors will not be paid; (3) a huge disparity in value between the property transferred and the consideration received; (4) the fact that the transferee is or was an officer, agent, or creditor of an officer of the corporate transferor; (5) insolvency of the debtor; and (6) the existence of a special relationship between the debtor and the transferee. *Id.; McCook Metals,* 319 B.R. at 588 n. 13 (*citing FBN Food Servs.*).

■ To establish a fraudulent conveyance under § 548(a)(1)(B), on the other hand, a trustee must prove the following elements: (1) a transfer of the debtor's property or interest therein; (2) made within two years of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) either (a) the debtor was insolvent when the transfer was made or he was rendered insolvent thereby; or (b) the debtor was engaged or about to become engaged in business or a transaction for which his remaining property represented an unreasonably small capital; or (c) the debtor intended to incur debts beyond his ability to repay them as they matured; or (d) the debtor made such transfer to or for the benefit of an insider. *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 505 (N.D.Ill.1988); *Barber v. Dunbar (In re Dunbar),* 313 B.R. 430, 434 (Bankr.C.D.Ill. 2004); *see also Dunham v. Kisak,* 192 F.3d 1104, 1109 (7th Cir.1999). The trustee must prove each element by a preponderance of the evidence. *McCook Metals,* 319 B.R. at 587.

1. **Whether the July 2003 Transfer of the Union Court Property Was Fraudulent Under § 548(a)(1)(A) and (B)**

■ First, the Court will address the Trustee's claim that the Debtor's transfer of the Union Court Property in July of 2003 to Schlossberg constituted actual fraud pursuant to § 548(a)(1)(A) and constructive fraud under § 548(a)(1)(B). The Trustee's cause of action against Schlossberg under § 548(a) for the July 2003 transfer of the Union Court Property fails because the transfer was not made within two years prior to the Debtor's bankruptcy filing. The Debtor filed his bankruptcy petition in October of 2005, which is twenty-seven months after the July 2003 transfer of the Union Court Property. Thus, the Trustee may not sustain a cause of action against Schlossberg under § 548(a)(1)(A) or (B) because the transfer was not within the two years before the date of the bankruptcy filing. The Court notes that Schlossberg did not raise this point at any stage of this proceeding. Despite that failing on the part of Schlossberg, the Court finds that the Trustee cannot sustain a cause of action under § 548 of the Code against Schlossberg for the Debtor's July 2003 transfer of his interest in the Union Court Property to Schlossberg.

2. **Whether the Transfer of the Tunbridge Property Was Fraudulent Under § 548(a)(1)(A)**

■ Next, the Court will address the Debtor's transfer of the Tunbridge Property to Schlossberg and whether that transaction constituted fraud in fact or actual fraud pursuant to § 548(a)(1)(A). Under § 548(a)(1)(A), a transfer can be fraudulent if it was made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). Because there is rarely direct evidence of intent underlying a transfer of property, courts look to circumstantial evidence, referred to as the badges of fraud, in determining whether a transfer was intended to hinder, delay, or defraud creditors. *FBN Food*

*Servs.*, 185 B.R. at 275. There was some evidence that the Debtor's transfer of the Tunbridge Property to Schlossberg was made with actual intent to hinder, delay, or defraud his creditors. The Debtor admittedly sold the Tunbridge Property to Schlossberg at a reduced price with the expectation that Schlossberg would resell the Property at a price higher and the Debtor and Schlossberg would share in the profits of that sale. (Trustee Ex. Nos. 48 & 49.) The Court finds that this admission by the Debtor in and of itself does not establish conclusively the Debtor's actual intent to hinder, delay, or defraud his creditors. Thus, the Court turns to the badges of fraud to determine whether the transfer of the Tunbridge Property was intended to harm the Debtor's creditors.

First, there was no evidence that the Debtor absconded with the proceeds of the transfer. On January 19, 2005, the Debtor sold the Tunbridge Property to Schlossberg for $325,000, which was $95,000 less than the Property's fair market value at the time. (Trustee Ex. Nos. 38–41 & 53.) There was no evidence adduced by the Trustee to show what the Debtor did with the proceeds he received from the sale. Thus, the Court cannot determine whether the Debtor absconded with the proceeds of the transfer immediately after their receipt.

Next, Schlossberg was not an officer, agent, or creditor of an officer of a corporate transferor. However, there was a special relationship between the Debtor and Schlossberg. They were business associates and friends. Schlossberg operates Assured Concepts Croup Limited, which provides financial planning services. (Trustee Ex. No. 66 at 4:17–5:9.) In addition, he is a licensed insurance broker. (*Id.* at 5:10–5:13.) Schlossberg also operates Assured Financial, a company that obtains mortgage loans for its clients, (*Id.*

at 5:21–6:10.) Schlossberg admitted that the Debtor was his client and that he had provided the Debtor with a life insurance policy. (*Id.* at 22:22–24:8.) According to the Debtor, Schlossberg also tried to procure a loan for the Debtor in order for him to purchase the Union Court Property in July of 2003.

The remaining three badges of fraud-the insolvency of the Debtor, absence of consideration when the transferor and transferee know that outstanding creditors will not be paid, and a huge disparity in value between the property transferred and the consideration received-warrant a more detailed discussion. The Bankruptcy Code employs a balance sheet approach to the question of insolvency. *Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs, Ltd.)*, 147 B.R. 140, 154 (Bankr.N.D.Ill.1992). Specifically, § 101(32) of the Code defines "insolvent" and states in relevant part that:

> "insolvent" means—
>
> (A) with reference to an entity ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> > (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> >
> > (ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A). The Seventh Circuit has interpreted this definition to require courts to determine what a willing buyer would pay for the debtor's entire package of assets and liabilities. *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir.1992). If the price is positive, the debtor is solvent; if the price is negative, the debtor is insolvent.

*Id.* A trustee may utilize appropriate means to prove insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence. *Freeland v. Enodis Corp. (In re Consol Indus. Corp.)*, 292 B.R. 354, 360 (N.D.Ind.2002).

With respect to whether the Debtor was insolvent, the evidence adduced at the trial showed that the Debtor was balance-sheet insolvent when the transfer of the Tunbridge Property was made to Schlossberg in January of 2005, or he was rendered insolvent thereby. As far back as July of 2003, when construction was complete on the Union Court Property, the Debtor had encountered financial problems. He testified that he was unable to obtain a mortgage on the Union Court Property to pay the balance due on the construction contract. In addition, the Debtor testified that he had a judgment entered against him personally by Peterson Farms. The Debtor admitted that he was "being sued by everybody," and was in financial straits in 2004. (Trustee Ex. No. 62 at 58:17–58:23.)

Moreover, the Debtor's business, Platinum, had financial problems. Platinum failed to perform under the 2003 agreement it had with AgriStar. Further, Steiner accused the Debtor of engaging in fraud, forgery, and misappropriation of AgriStar's money. In 2004, the United States Department of Agriculture filed an administrative action against Platinum for PACA violations, and in 2005, Platinum was cited for PACA infractions. The Debtor, as the administrator of Platinum's PACA license, was personally liable for these violations. Thus, the Court finds that the Debtor experienced insolvency as far back as 2003 and endured numerous judgments, liens, foreclosures, and other financial difficulties related to Platinum

and other ventures. (Trustee Ex. No. 50, Amended Statement of Financial Affairs.)

Additionally, a review of the Debtor's Schedules and Statement of Financial Affairs will assist in the determination of the Debtor's solvency. Pursuant to the Debtor's Amended Schedule A, he did not own any real property nine months after the transfer of the Tunbridge Property to Schlossberg. (Trustee Ex. No. 50, Amended Schedule A.) On his Amended Schedule B, the Debtor listed personal property in the total amount of $15,600. (*Id.* Amended Schedule B.) The Debtor listed unsecured debt in the amount of $848,268. (*Id.* Amended Schedule F.) The Debtor's schedule of current income shows that this monthly income totaled $5,600. (*Id.* Amended Schedule J.) The Debtor listed monthly expenses of $13,102. (*Id.* Amended Schedule J.) Based on this evidence, the Debtor's liabilities of $848,268 exceeded his listed assets of $15,600. Moreover, his monthly expenses of $13,102 greatly surpassed his monthly income of $5,600. Hence, the Court concludes that the Debtor was balance-sheet insolvent when the transfer of the Tunbridge Property was made to Schlossberg in January 2005, or he was rendered insolvent thereby.

Furthermore, the Court finds an absence of consideration when the Debtor knew that by selling the Tunbridge Property to Schlossberg at a bargain rate, his outstanding creditors would not be paid. The transfer to Schlossberg was made nine months prior to the Debtor's bankruptcy filing. As evidenced by his Schedules and Statement of Financial Affairs, the Debtor had outstanding debts when he sold the Tunbridge Property. (Trustee Ex. No. 50.)

Finally, the Court must determine whether there was a huge disparity in value between the property transferred

and the consideration received. The Debtor sold the Tunbridge Property to Schlossberg in January of 2005 for $325,000, which was $95,000 less than it was appraised for in December of 2004. Schlossberg turned around and sold the Property less than one year later for $455,000 at a $130,000 profit. Schlossberg and the Debtor had an agreement whereby the Debtor would receive a forty percent portion of the profits and Schlossberg would receive sixty percent of the profits. Thus, the Court finds that Schlossberg received more than the Debtor received for the sale of the Tunbridge Property. Based on this, there was a huge disparity in value between the property transferred and the consideration received.

In sum, four out of six badges of fraud have been shown here. Thus, the Court finds this constitutes a sufficient number to infer actual fraud. In short, the Court finds that the trial testimony and the documentary evidence establish that the Debtor deliberately and fraudulently sold the Tunbridge Property to Schlossberg at a below market rate with the intent to share in the profits when Schlossberg resold the Property. Hence, the Court finds that the Trustee has established by both clear and convincing evidence and a preponderance of the evidence that the Debtor's transfer of the Tunbridge Property to Schlossberg constituted actual fraud under § 548(a)(1)(A). Thus, the Trustee may avoid the transfer.

### 3. Whether the Transfer of the Tunbridge Property Was Fraudulent Under § 548(a)(1)(B)

■ Next, the Court will address whether the Debtor's transfer of the Tunbridge Property to Schlossberg was constructively fraudulent under § 548(a)(1)(B). The Court finds that the Trustee has demonstrated all of the requisite elements to establish a constructively fraudulent transfer. First, the Court finds that the Debtor made a transfer of his interest in the Tunbridge Property. Next, the transfer was made in January of 2005, approximately nine months prior to the Debtor's bankruptcy filing in October of 2005. Moreover, the Court found *supra* that the Debtor was insolvent when the transfer was made or was rendered insolvent thereby. Also, the Court finds that when the Debtor transferred his interest in the Tunbridge Property to Schlossberg, he had already incurred debts that would be beyond his ability to pay as they matured. The Debtor had several pending judgments entered against him. Further, as evidenced by his Schedules and Statement of Financial Affairs, his expenses far exceeded his income, and his assets were substantially less than his liabilities. (Trustee Ex. No. 50.) Thus, the Court infers that after the transfer, the Debtor must have known that he would continue to incur debts beyond his ability to pay them as they matured.

Additionally, the Court finds that Schlossberg was an "insider" of the Debtor. With respect to an individual debtor, the term "insider" is defined to include a relative of the debtor or of a general partner of the debtor; a partnership in which the debtor is a general partner; a general partner of the debtor; or a corporation of which the debtor is a director, officer, or person in control. 11 U.S.C. § 101(31)(A). Clearly, Schlossberg was not a relative of the Debtor, and the Debtor was not a director, officer, or person in control of a corporation. The Trustee argues that Schlossberg was a partner of the Debtor, and thus, should be considered an insider.

■ The Bankruptcy Code's statutory definition of "insider" is intended to be illustrative rather than exhaustive. *In re Krehl*, 86 F.3d 737, 741 (7th Cir.1996).

In ascertaining insider status, courts look to the closeness of the relationship between the parties and whether the transactions between them were conducted at arm's length. *Id.* at 742, The Court finds that as a result of the close relationship between Schlossberg and the Debtor, Schlossberg was an insider of the Debtor. Their transactions involving the Tunbridge Property were not conducted at arm's length. Rather, their dealings amounted to a scheme devised by the Debtor to shield this asset from his creditors and then share in the profits of the resale. Schlossberg was aware of the scheme and was a willing participant.

▪▪▪ Lastly, the Court must determine whether the Debtor received consideration from Schlossberg that had a value that was reasonably equivalent to the value of the Tunbridge Property. The Bankruptcy Code does not define the term "reasonably equivalent value." The Seventh Circuit, however, has stated that the test utilized to determine "reasonably equivalent value" requires courts to determine the value of what was transferred and compare that value to the value the debtor received. *Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir.1997). The determination of "reasonably equivalent value" is not a fixed mathematical formula. *Id.* Section 548(d)(2)(A) of the Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor...." 11 U.S.C. § 548(d)(2)(A).

▪▪▪ Indeed, determination of "reasonably equivalent value" under § 548(a)(1)(B) is a two-step process. *Anand v. Nat'l Republic Bank of Chi.,* 239 B.R. 511, 516–17 (N.D.Ill.1999). A court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up. *Id.* at 517. The second inquiry—whether what the debtor gave up was reasonably equivalent to what he received—is more difficult. *Id.* "Equivalent value must be measured as of the time of the transfer." *McCook Metals,* 319 B.R. at 589. *Accord Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 840 (Bankr.N.D.Ill.2007).

▪▪▪ Whether "reasonably equivalent value" has been given is a question of fact that depends on the circumstances surrounding the transaction. *Barber,* 129 F.3d at 387. The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.; Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.),* 238 B.R. 758, 773 (Bankr.N.D.Ill.1999), "Fair market value is defined as 'the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.'" *Doctors Hosp. of Hyde Park,* 360 B.R. at 840 (*quoting* Black's Law Dictionary 1587 (8th ed.2004)). The Trustee bears the burden of proof on this issue. *See Barber,* 129 F.3d at 387.

The Court finds that based on the evidence, the Debtor did not receive a reasonably equivalent value for the transfer of his interest in the Tunbridge Property. The Court will examine the factors utilized to make this determination. As previously discussed, the Court found that the fair market value of the Tunbridge Property at the time of the January 2005 transfer was $420,000 pursuant to the appraisal dated December 2004. (Trustee Ex. No. 58.) The Debtor sold the Tunbridge Property to Schlossberg for $95,000 less than its fair

market value. Less than one year later, Schlossberg resold the Property to an apparent bona fide purchaser for $130,000 more than he purchased it. Schlossberg and the Debtor agreed to split the profits of the resale. The Debtor received forty percent and Schlossberg received sixty percent of the profits. That split is not reasonable or equivalent on the exchange.

Furthermore, the Court finds that the transaction did not take place at arm's length. The initial sale of the Tunbridge Property to Schlossberg was for $95,000 less than its fair market value. The Debtor and Schlossberg had an agreement whereby Schlossberg would resell the Property and share with the Debtor forty percent of the profits he made on the sale. Finally, the Court finds that, based on this side agreement between the Debtor and Schlossberg, Schlossberg lacked good faith. Based on these factors, the Court concludes that the consideration the Debtor received from Schlossberg did not have a value that was reasonably equivalent to the value of the Debtor's interest in the Tunbridge Property.

In sum, the Court finds that the Trustee had met all of the elements to establish that the transfer of the Tunbridge Property to Schlossberg was constructively fraudulent under § 548(a)(1)(B). Thus, the Trustee may avoid the Debtor's transfer of the Tunbridge Property to Schlossberg.

### 4. Recovery Under 11 U.S.C. § 550(a)

Pursuant to 11 U.S.C. § 550(a), the Trustee seeks to recover from Schlossberg, for the benefit of the Debtor's estate, the value of the property transferred by the Debtor to Schlossberg. A court must first make a determination whether the transfer was fraudulent under § 548(a) and, therefore, avoidable before that transfer can be recovered under § 550(a). When a transfer is avoided under $548(a),

the next step is to look to § 550(a). Section 550(a) sets forth the parties from whom fraudulent transfers can be recovered, *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 880 (Bankr.N.D.Ill. 2006), and provides as follows:

> (a) Except as otherwise provided in this section, *to the extent that a transfer is avoided under section ... 548 ... of* this title, *the trustee may recover, for the benefit of the estate*, the property transferred, or, *if the court so orders, the value of such property*, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a) (emphasis supplied). Moreover, under § 550(d), a trustee is "entitled to only a single satisfaction under subsection (a) of this section." 11 U.S.C. § 550(d).

Section 550(a) is a secondary cause of action after a trustee has prevailed pursuant to the avoidance sections of the Bankruptcy Code. *Santee v. Nw. Nat'l Bank (In re Mako, Inc.)*, 127 B.R. 471, 473 (Bankr.E.D.Okla.1991). "Section 550(a) stands as a recovery statute only and not as a primary avoidance basis for an action, as it will only survive when coupled with the transfer avoidance sections of the Code." *Id.* Even though an action to avoid a transfer may be, and often is, brought in conjunction with an action to recover the property transferred or its value, a court must evaluate the two bases of relief separately. *SKK Liquidation Trust v. Green & Green, LPA (In re Spinnaker Indus., Inc.)*, 328 B.R. 755, 764 (Bankr.S.D.Ohio 2005); *Barber v. McCord Auto Supply, Inc. (In re Pearson Indus., Inc.)*, 178 B.R. 753, 759 (Bankr. C.D.Ill.1995).

Section 550(a) effectively limits actions to only those that benefit the estate. *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1118 (7th Cir.1998); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 126 (Bankr. N.D.Ill.2004). Section 550 allows the trustee to recover the entire value of the property transferred, even if it exceeds the debt to the creditor that provided the basis for the action. *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 670 (Bankr.N.D.Ind. 2005). "Once the whole transfer has been pulled into the estate, the money is distributed according to the priorities established by the Code and the debtor's own commitments." *FBN Food Servs.*, 82 F.3d at 1396.

The Bankruptcy Code does not define the term "transferee" for purposes of § 550(a). The Seventh Circuit, however, explains that a "transferee" has "dominion over the money or other asset, the right to put the money to one's own purposes," *Bonded Fin.*, 838 F.2d at 893. The "initial" transferee is the first entity to have such a dominion or right. *Kepler v. Aetna Fin. Co. (In re Ausman Jewelers, Inc.)*, 177 B.R. 282, 286 (Bankr.W.D.Wis. 1995). The Court finds that. Schlossberg was the initial transferee of the Tunbridge Property. He had dominion over the asset and was able to resell the Property to another purchaser in December of 2005.

Because the Conn determined that the transfer of the Tunbridge Property from the Debtor to Schlossberg was a fraudulent conveyance pursuant to § 548(a)(J)(A) and (B), the Trustee may recover the value thereof under § 550(a)(1) from Schlossberg. The evidence demonstrated that the Debtor sold the Tunbridge Property to Schlossberg for $95,000 less than its fair market value. Thus, the Trustee may recover this sum from

Schlossberg as the lost value on the sale of the Tunbridge Property. Further, the evidence showed that the Debtor was entitled under his agreement with Schlossberg to forty percent of the difference between the $455,000 price at which Schlossberg sold the Tunbridge Property and the $420,000 fair market value. Hence, the Trustee may recover an additional $14,000 from Schlossberg ($455,000–$420,000 = $35,000 × .40% = $14,000).

In sum, the Court allows the Trustee to recover, for the benefit of the Debtor's estate, the value of the Debtor's interest in the Tunbridge Property from Schlossberg. Thus, the Trustee may recover the sum of $109,000 ($95,000 + $14,000) from Schlossberg for the benefit of the Debtor's estate under § 550(a)(1).

**B. Count II: 740 Ill. comp. Stat. 160/5 and 160/6 and 11 U.S.C. § 544**

Pursuant to Count 11 of the amended complaint, the Trustee alleges that within four years of the date of the filing of his bankruptcy petition, the Debtor repeatedly transferred valuable assets, namely, the Union Court Property and the Tunbridge Property out of his possession and into the possession of Schlossberg with the actual intent to delay, hinder, and defraud his creditors. The Trustee asserts that the February 10, 2004 e-mail correspondence from the Debtor to Schlossberg indicates that the Debtor entered into the Union Court Property transaction in order to transfer his interest therein with the actual intent to hinder and defraud his creditors. The Debtor allegedly retained possession and control of the Union Court Property while concealing his real interest in that asset. Further, the Trustee avers that the Debtor admitted that he received a kickback from Schlossberg on the sale of the Tunbridge Property. The Trustee alleges that as the Debtor's friend and close

business associate, Schlossberg was an "insider" for purposes of the transfers. According to the Trustee, the transfers of the Union Court Property and the Tunbridge Property constituted conveyances of substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of his debts exceeded all of his assets. The Trustee contends that the transfers of the Union Court Property and the Tunbridge Property to Schlossberg were fraudulent under 740 ILL. COMP. STAT. 160/5 and 160/6 and should be avoided under 11 U.S.C. § 544 to the extent necessary to satisfy the claims against the Debtor's estate pursuant to 740 ILL. COMP. STAT. 160/8.

■■■ Section 544(b)(1) of the Bankruptcy Code expressly authorizes a trustee to avoid a transfer voidable under applicable state law and provides in pertinent part as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). In essence, this provision allows a trustee to take advantage of state law with respect to fraudulent conveyances. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 202 (7th Cir.1988).

■■■ In a matter under § 544(b)(1), the trustee has the rights of an unsecured creditor to avoid transactions that can be avoided by such creditor under state law. *Frierdich,* 294 F.3d at 867; *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),* 139 F.3d 574, 576–77 (7th Cir.1998). The trustee need not identify the creditor, as long as an unsecured creditor exists. *Image Worldwide,* 139 F.3d at 577; *In re Leonard,* 125 F.3d 543, 544 (7th Cir.1997). The transaction can be

avoided completely even if the trustee cannot produce creditors whose liens total more than the value of the property. *Leonard,* 125 F.3d at 544–45.

In the matter at bar, the Trustee has demonstrated, and Schlossberg does not dispute, that the Debtor has numerous unsecured creditors. The Debtor's Amended Schedule F shows that he had $848,268 in unsecured debt as of the date of the bankruptcy filing. (Trustee Ex. No. 50, Amended Schedule F.) Accordingly, the Trustee may proceed against Schlossberg under Illinois law.

The applicable state law asserted by the Trustee under § 544(b)(1) is the Illinois Uniform Fraudulent Transfer Act (the "UFTA"). 740 ILL. COMP. STAT. 160/1 *et seq.* Section 160/5(a) of the UFTA addresses claims that arose before or after the alleged fraudulent transfer and § 160/6 speaks to claims that arose before the alleged fraudulent transfer was made. These sections provide as follows:

> § 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) intended to incur, or believed or reasonably should have believed that

he would incur, debts beyond his ability to pay as they became due.

§ 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILL. COMP. STAT. 160/5(a) and 160/6.[5]

Sections 160/5 and 160/6 of the UFTA parallel § 548(a)(1) of the Code.[6] *Doctors Hosp. of Hyde Park*, 360 B.R. at 839; *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 443 (Bankr. N.D.Ill.1995). "Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA." *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998) (citing *Randy*, 189 B.R. at 443). *Accord Image Worldwide*, 139 F.3d at 577 (finding that because the Illinois UFTA is a uniform act which has derived phrases from § 548, courts may look to cases decided

under § 548, as well as cases interpreting other states' versions of the UFTA, for assistance).

Pursuant to § 160/5(a) of the UFTA, a trustee may recover a transfer made by a debtor under two circumstances: (1) if the debtor made the transfer with actual intent to hinder, delay, or defraud a creditor; or (2) if the debtor did not receive a reasonably equivalent value in exchange for the transfer and was insolvent at the time of the transfer or became insolvent as a result of the transfer. 740 ILL. COMP. STAT. 160/5(a). The UFTA speaks to two types of fraud—"fraud in fact" and "fraud in law." *Scholes v. Lehmann*, 56 F.3d 750, 756–57 (7th Cir.1995).

 "Fraud in fact" or actual fraud pursuant to § 160/5(a)(1) of the UFTA occurs when a debtor transfers property with the intent to hinder, delay, or defraud his creditors. *Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 946 (Bankr.N.D.Ill.1992). The trustee must prove that there was a specific intent to hinder, delay, or defraud. *Stone v. Ottawa Plant Food, Inc. (In re Hennings Feed & Crop Care, Inc.)*, 365 B.R. 868, 874 (Bankr. C.D.Ill.2007). This Court has held that the movant has the burden of proving all elements of actual fraud under Illinois law by clear and convincing evidence. *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 732 (Bankr.N.D.Ill.2006), *aff'd*, No. 07 C 1697, 2007 WL 1498906 (N.D.Ill. May 18, 2007); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 372–73 (Bankr. N.D.Ill.2005) (collecting cases). *Accord*

---

**5.** The Trustee does not specify in his amended complaint whether he is seeking relief under subsection (a) or (b) of § 160/6. Thus, the Court will address both subsections.

**6.** An important difference between § 548 and the UFTA is that § 548 authorizes avoidance of transfers made within two years before the bankruptcy filing. 11 U.S.C. § 548(a). Cer-

tain causes of action for fraudulent conveyances can be brought under the UFTA, however, within four years after the transfer was made. 740 ILL. COMP. STAT. 160/10(a) & (b). Three of the four transfers at issue were made within the two-year period under the Bankruptcy Code. Hence, the Trustee may proceed under both the Code and the UFTA.

*Hennings Feed,* 365 B.R. at 874; *Martin,* 145 B.R. at 946. *But see McCook Metals,* 319 B.R. at 587 n. 11 (declining to decide whether the higher standard of proof would apply to an actual fraud claim under the UFTA).

In determining whether a transfer is made with actual intent to defraud, the UFTA sets forth several factors—also known as the "badges of fraud"—from which an inference of fraudulent intent may be drawn. Section 160/5(b) of the UFTA sets forth the following indicia:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILL. COMP. STAT. 160/5(b).

When these "badges of fraud" are present in sufficient, number, they may give rise to an inference or presumption of fraud. *Knippen,* 355 B.R. at 732–33 (*citing Steel Co. v. Morgan Marshall Indus., Inc.,* 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595, 602 (1996)). The presence of seven badges of fraud has been held sufficient to raise a presumption of fraudulent intent. *See Berland v. Mussa (In re Mussa),* 215 B.R. 158, 170 (Bankr.N.D.Ill. 1997), Under the Federal Rules of Evidence, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift ... the burden ... in the sense of the risk of nonpersuasion, which remains ... upon the party on whom it was originally cast." FED.R.EVID. 301.

Under the UFTA, an "insider" of an individual debtor includes a relative of the debtor or of a general partner of the debtor, or a general partner in a partnership, 740 ILL. COMP. STAT. 160/2(g)(1)(A) & (B). In addition, the UFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILL. COMP. STAT. 160/3(a). This definition of insolvency mirrors the balance-sheet test for insolvency under the Bankruptcy Code. 11 U.S.C. § 101(32). The UFTA also provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 ILL. COMP. STAT. 160/3(b). Courts have broad discretion when considering evidence to support a finding of insolvency. *Doctors Hosp. of Hyde Park,* 360 B.R. at 853. Insolvency is a question of fact. *Id.*

Under § 160/5(a)(2) of the UFTA, "fraud in law," on the other hand, docs not require any showing of fraudulent intent. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.1997); *Scholes*, 56 F.3d at 757. Rather, fraud is presumed if a debtor transfers property for less than adequate value and is thereby unable to meet his obligations. *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 73 (Bankr.N.D.Ill. 2002). Because of its nature, the conveyance is deemed constructively fraudulent. *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 257 B.R. 253, 268 (Bankr.N.D.Ill. 2001). The trustee has the burden of proving fraud in law by a preponderance of the evidence. *Hennings Feed*, 365 B.R. at 875; *Joy Recovery*, 286 B.R. at 73; *Martin*, 145 B.R. at 946. A different standard of proof applies to this theory because intent to defraud is presumed when the elements of constructive fraud are established. *Martin*, 145 B.R. at 946. The distinction between "fraud in fact" and "fraud in law" is derived from whether or not there is any consideration for the conveyance at issue. *Knippen*, 355 B.R. at 733 (*citing Second Nat'l Bank of Robinson v. Jones*, 309 Ill.App. 358, 33 N.E.2d 732, 736 (1941)).

In order for a trustee to establish that a conveyance is fraudulent in law under § 160/5(a)(2), four elements must be present: (1) the debtor made a voluntary transfer; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; (3) at the time of the transfer, the debtor had incurred obligations elsewhere; and (4) after the transfer, the debtor failed to retain sufficient property to pay his indebtedness. *Lease Resolution*, 128 F.3d at 1079; *Hennings Feed*, 365 B.R. at 874.

The term "reasonably equivalent value" is not defined in the UFTA nor has it been defined by Illinois case law. *Hennings Feed*, 365 B.R. at 878. The Illinois Supreme Court, in discussing a prior statute, stated that one of the necessary elements to establish a fraudulent conveyance is that "there must be a transfer made for no or inadequate consideration[.]" *Gendron v. Chi. & N.W. Transp. Co.*, 139 Ill.2d 422, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1215 (1990). *See also Image Worldwide*, 139 F.3d at 577 (discussing Illinois's interpretation of "reasonably equivalent value"); *Regan v. Ivanelli*, 246 Ill.App.3d 798, 187 Ill.Dec. 351, 617 N.E.2d 808, 814 (1993) (*citing Gendron*). In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. *Image Worldwide*, 139 F.3d at 577.

Section 160/6(a) of the UFTA provides another cause of action for fraud in law. *Hennings Feed*, 365 B.R. at 874. The elements of a cause of action under § 160/6(a) of the UFTA are: (1) a transfer was made by the debtor; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer. *Id.; Joy Recovery*, 286 B.R. at 77; *In re Liquidation of MedCare HMO, Inc.*, 294 Ill.App.3d 42, 228 Ill.Dec. 502, 689 N.E.2d 374, 380 (1997); *Falcon v. Thomas*, 258 Ill.App.3d 900, 196 Ill.Dec. 244, 629 N.E.2d 789, 795 (1994). The first two elements of § 160/6(a) are the same as those of § 160/5(a)(2). *Joy Recovery*, 286 B.R. at 77. Intent is not an element under § 160/6(a). *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir. 2002). One difference between § 160/6 and § 160/5 is that § 160/6 includes the requirement that a creditor who has the right to assert some claim must have a

claim that arose before the alleged fraudulent transaction. *Joy Recovery*, 286 B.R. at 77.

■ Lastly, a fraudulent transfer claim brought under § 160/6(b) of the UFTA is commonly referred to as an insider preference claim. *Arachnid, Inc. v. Valley Recreation Prods., Inc.*, No. 98 C 50282, 2001 WL 1664052, at *6 (N.D.Ill.Dec.27, 2001). This cause of action must be filed within one year after the transfer was made, 740 Ill. Comp. Stat. 160/10(c). Under § 160/6(b), the elements of the cause of action are: (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer to an insider for an antecedent debt; (3) the debtor was insolvent at the time of the transfer; and (4) the insider had reasonable cause to believe that the debtor was insolvent, 740 Ill. Comp. Stat. 160/6(b).

Once the fraudulent nature of a transaction is established, further reference to the UFTA is necessary. Section 160/8(a)(1) provides as follows:

§ 8. (a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]

740 Ill. Comp. Stat. 160/8(a)(1).

In addition, § 160/9 states in pertinent part as follows:

(b) Except as otherwise provided in this Section, to the extent a transfer is voidable in an action by a creditor under paragraph (1) of subsection (a) of Section 8, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee.

(c) If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

740 Ill. Comp. Stat. 160/9(b) & (c).

These provisions of the UFTA establish that, once transfers have been deemed fraudulent, and thus voidable, a trustee is entitled to recover the property transferred or obtain a money judgment for the value of the assets transferred, less certain adjustments for the amounts paid by the transferee, *Hennings Feed*, 365 B.R. at 890. Here, the Trustee seeks money judgments against Schlossberg, Laliberte, and Carlos.

### 1. Whether the Transfer of the Tunbridge Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/5(a)(1)

■ First, the Court will address the Trustee's claim that the transfer of the Debtor's interest in the Tunbridge Property to Schlossberg constituted fraud in fact or actual fraud pursuant to § 160/5(a)(1) of the UFPA. Because § 160/5 parallels § 548(a)(1) of the Code, the findings made by the Court with respect to § 548(a)(1)(A) apply to the Trustee's cause of action under § 16075(a)(1). *See Spatz*, 222 B.R. at 164; *Randy*, 189 B.R. at 443. Accordingly, the Court finds that the Trustee has demonstrated that the transfer of the Debtor's interest in the Tunbridge Property to Schlossberg constituted actual fraud

under § 160/5(a)(1) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sum of $109,000, which represents the value of the Debtor's interest in the Tunbridge Property.

2. Whether the Transfer of the Tunbridge Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/5(a)(2)

■ Next, the Court will address the Trustee's claim that the transfer of the Debtor's interest in the Tunbridge Property to Schlossberg constituted constructive fraud pursuant to § 160/5(a)(2) of the UFTA. Because § 160/5 parallels § 548(a)(1) of the Code, the findings made by the Court with respect to § 548(a)(1)(B) apply to the Trustee's cause of action under § 160/5(a)(2). *Id.* Accordingly, the Court finds that the Trustee has demonstrated that the transfer of the Debtor's interest in the Tunbridge Property constituted constructive fraud under § 160/5(a)(2) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sum of $109,000, which represents the value of the Debtor's interest in the Tunbridge Property.

3. Whether the Transfer of the Tunbridge Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/6(a)

Next, the Court finds that the Trustee has demonstrated all of the requisite elements to sustain a cause of action against Schlossberg under § 160/6(a) of the UFTA. First, the Trustee established that creditors' claims arose before the transfer of the Tunbridge Properly. Specifically, the Debtor's Amended Schedule F shows unsecured debt in excess of $848,000, (Trustee Ex. No. 50, Amended Schedule F.) Many of those debts were incurred several years prior to the transfer of the Tunbridge Property. (*Id.*) Second, the Trustee established that a transfer was made of the Debtor's interest in the Tunbridge Property to Schlossberg. Third, as discussed *supra*, the Trustee demonstrated that the transfer was made without the Debtor receiving a reasonably equivalent value in exchange for the transfer. Finally, the Court determined previously that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.

Thus, the Trustee has established all of the elements necessary to sustain a cause of action against Schlossberg under § 160/6(a) of the UFTA. Pursuant to § 160/9(b), the Court enters judgment against Schlossberg in the sum of $109,000 and in favor of the Trustee. The transfer of the Tunbridge Property is avoidable under § 544(b)(1) and § 160/8(a)(1). Under § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit, of the Debtor's estate, $109,000, which represents the value of the Debtor's interest in the Tunbridge Property.

4. Whether the Transfer of the Tunbridge Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/6(b)

■ Finally, the Court must determine whether the Trustee has established all of the necessary elements to sustain a cause of action against Schlossberg under § 160/6(b) of the UFTA. This cause of action must be filed within one year after the transfer was made. 740 ill. comp. stat. 160/10(c). The Court finds that the Trustee failed to file this cause of action within

one year after the transfer was made. The Tunbridge Property was transferred by the Debtor to Schlossberg in January of 2005, and Schlossberg sold the Tunbridge Property in December of 2005. The Trustee filed the instant adversary proceeding in 2007, which is more than one year after the transfer was made to Schlossberg. Therefore, the Trustee may not sustain a cause of action against Schlossberg under § 160/6(b) of the UFTA.

## 5. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/5(a)(1)

Now, the Court will address the Trustee's claim that the transfer of the Debtor's interest in the Union Court Property to Schlossberg constituted fraud in fact or actual fraud pursuant to § 160/5(a)(I) of the UFTA. Initially, the Court notes that the Trustee can proceed under the UFTA with respect to the Debtor's July 2003 transfer of the Union Court Property because the Trustee filed this cause of action in May of 2007, within four years of the transfer of the Property to Schlossberg. See 740 ILL. COMP. STAT. 160/10. Under § 160/5(a)(I), a transfer can be fraudulent if it was made with "actual intent to hinder, delay, or defraud" a creditor of the debtor. 740 ILL. COMP. STAT. 160/5(a)(1).

The Debtor made cash payments totaling $120,000 toward the purchase price of $804,674.50 pursuant to the sales contract for the Union Court Property. By the time construction on the Union Court Property was complete, however, the Debtor had begun to experience financial problems personally and with his business, Platinum. Accordingly, he sought to shield his assets from his creditors. The Debtor entered into an agreement with business associates Schlossberg and Laliberte, whereby Schlossberg and Laliberte would purchase the Union Court Property acting as strawmen for the Debtor's benefit. As an inducement to act as the strawmen for the Debtor, the Debtor agreed to pay a premium on the underlying obligation undertaken by Schlossberg and Laliberte. The premium was to be the difference between a fixed rental amount and the mortgage obligation to be undertaken by Schlossberg and Laliberte, thereby creating a "spread" that would amount to Schlossberg and Laliberte's profit on the transaction.

On the July 23, 2003 closing date of the sale of the Union Court Property, Schlossberg, Laliberte, and the Debtor signed an assignment of real estate contract (Trustee Ex. No. 16) that allowed Schlossberg and Laliberte to purchase the Union Court Property at closing instead of the Debtor. (Id.) Schlossberg and Laliberte did not pay anything for this assignment and received the benefit of the $120,000 mat the Debtor had already paid to the seller of the Union Court Property. The Debtor, Schlossberg, and Laliberte also executed a document titled articles of agreement for deed that purported to sell the Union Court Property from Schlossberg and Laliberte back to the Debtor. (Trustee Ex. No. 19.) This document was executed several days prior to the July 23, 2003 closing of the Union Court Property even though Schlossberg and Laliberte did not own the Property at that time. The Debtor testified that it was the intent of the parties that the Debtor retain his equity interest in the Union Court Property. At the July 23, 2003 closing, Schlossberg and Laliberte purchased the Union Court Property with the $120,000 of equity invested by the Debtor, and obtained mortgages for the remaining $643,079.60. (Trustee Ex. Nos. 21 & 22.)

Unlike most cases, here there is direct evidence that the transfer of the Debtor's interest in the Union Court Property in July 2003 to Schlossberg and Laliberte was made by the Debtor with actual intent to hinder, delay, or defraud his creditors. In the February 10, 2004 e-mail correspondence to Schlossberg, the Debtor admitted that he entered into an agreement with Schlossberg and Laliberte in order to protect his assets from his creditors. Specifically, the Debtor stated, "[t]his contract for deed is a great way to protect my assests [sic] since I trust you and you hold title I am asset free almost ... i.e. 'why sue Jeff, he aint [sic] got nothin!' [sic] ... I like the idea of keeping my house safe." (Trustee Ex. No. 23.)

Even though direct evidence of the Debtor's fraudulent intent exists, the Court turns to the badges of fraud to determine whether the July 2003 transfer of the Union Court Property was intended to harm the Debtor's creditors. The Court finds that the documentary evidence and the testimony of the witnesses at trial demonstrate that most of the badges of fraud are present with respect to the July 2003 transfer of the Union Court Property.

First, the Court, found *supra* that Schlossberg was an insider of the Debtor based on their friendship as well as their business dealings. The Court also finds that Schlossberg was an insider because he was a partner of the Debtor, Schlossberg and Laliberte entered into a partnership agreement whereby they agreed to purchase the Union Court Property for the Debtor's benefit. (Trustee's Ex. No. 13.) The Debtor was not a party to this partnership agreement between Schlossberg and Laliberte. Nevertheless, the Court finds that Schlossberg and Laliberte were general partners or joint venturers of the Debtor by virtue of the side agreement they had with the Debtor to purchase the

Union Court Property and then resell it to the Debtor at a later date under the contract for deed. The Debtor's "equity" in the Union Court Property was preserved via the doctrine of equitable conversion. *See generally In re Streets & Beard Farm P'ship*, 882 F.2d 233 (7th Cir.1989) (stating that a debtor became the equitable owner of property upon entry into an installment land contract under the doctrine of equitable conversion).

Second, the Debtor retained possession of and control over the Union Court Property and resided there with Christine and their children under his side agreement with Schlossberg and Laliberte. Third, even though the warranty deed for the sale of the Union Court Property to Schlossberg and Laliberte was recorded and therefore disclosed, the side agreements that the Debtor had with Schlossberg and Laliberte were concealed. The assignment of the real estate contract was not disclosed. Fourth, before the transfer was made, the Debtor had been sued and threatened with suit. He was threatened with suit or had been sued by AgriStar and Steiner, and he was involved in litigation with the United States Department of Agriculture with respect to Platinum's PACA violations. Indeed, the Debtor stated that he was "being sued by everybody...." (Trustee Ex. No. 62 at 58:16–58:23.)

Next, there was no evidence adduced to show that the transfer of the Union Court Property constituted a transfer of substantially all of the Debtor's assets or that the transfer occurred shortly before or after a substantial debt was incurred.

Moreover, there was no evidence adduced to show that the Debtor absconded with any proceeds. The Debtor transferred his interest in the Union Court Property, including his $120,000 equity investment, to Schlossberg and Laliberte,

but did not receive any value in exchange for that transfer. Rather, the Debtor removed the $120,000 equity interest he had in the Union Court Property and transferred that interest to Schlossberg and Laliberte.

Further, the Court finds that the Debtor was insolvent or became insolvent after the transfer was made. The Debtor testified at trial that he was unable to obtain a loan in order to fund the full purchase price of the Union Court Property. Additionally, as the Court noted *supra*, the Debtor experienced insolvency as far back as 2003 and endured numerous judgments, liens, foreclosures, and other financial difficulties related to Platinum and other ventures. (Trustee Ex. No. 50, Amended Statement of Financial Affairs.)

Next, the Court finds that based on the evidence adduced at trial, the Debtor did not receive a reasonably equivalent value for the transfer of his interest in the Union Court Property to Schlossberg. The Court will examine the factors utilized to make this determination. As previously discussed, the purchase price for the Union Court Property was $804,674.50 (Trustee Ex. No. 17), and the Debtor made cash payments totaling $120,000 toward the purchase of the Property. (Trustee Ex. Nos. 7, 17, & 62 at 49:6–49:19.) Schlossberg and Laliberte did not. give the Debtor any value for their right to purchase the Union Court Property. They had the benefit of the $120,000 the Debtor had previously paid to the seller, Bartlett One L.L.C. Schlossberg and Laliberte obtained mortgages in the sum of $643,079.60 to close the purchase of the Union Court Property. This amount was lower than the full purchase price because it was reduced by the $120,000 that the Debtor had already paid. Schlossberg and Laliberte thus received the benefit of the $120,000 that the Debtor paid for the Union Court Property without giving the Debtor anything of value in exchange. Even though the Debtor resided in the Union Court Property with his family, he paid rent to Schlossberg and Laliberte. Moreover, the Court finds that the transaction did not take place at arm's length. The Debtor devised a scheme whereby Schlossberg .and Laliberte were to act as his contract purchasers to buy the Union Court Property in their names in order to assist the Debtor in "keeping (his) house safe." (Trustee Ex. No. 23.)

The Court further finds that there was evidence proffered to show that Schlossberg lacked good faith. Schlossberg admitted to being a party to the agreements he had with Laliberte and the Debtor. (Trustee Ex. Nos. 16, 19, 26 & 66 at 52:6–54:13.) Based on these factors, the Court concludes that the consideration that the Debtor received from Schlossberg and Laliberte under the terms of their agreement did not have a value that was reasonably equivalent to the value of the Debtor's $120,000 interest in the Union Court Property.

Finally, the Court must determine whether there was a huge disparity in value between the property transferred and the consideration received. The Court finds that there was no actual consideration given for the Debtor's July 2003 transfer of the Union Court Property to Schlossberg and Laliberte. The Debtor paid $120,000 toward the purchase of the Union Court Property, but Schlossberg and Laliberte did not pay the Debtor or otherwise convey to him any consideration for their right to purchase the Union Court Property with the benefit of the $120,000 that the Debtor had already paid to the seller. In fact, the Debtor paid rent to Schlossberg and Laliberte after their acquisition of the Union Court Property. No value was paid or otherwise conveyed

to the Debtor by Schlossberg and Laliberte in consideration for their right to purchase the Union Court Property with the benefit of the $120,000 that the Debtor had already paid. As a result, there was a huge disparity in value between the property transferred and the consideration received. Schlossberg and Laliberte benefitted from the Debtor's $120,000 payment toward the purchase of the Union Court Property, and in return, the Debtor was required to pay rent to them in order to reside in the house.

In sum, most of the badges of fraud have been shown here. Hence, based on the badges of fraud, as well as the direct evidence of the Debtor's intent to keep his assets from his creditors, the Court finds that the Trustee has established that the Debtor's transfer of the Union Court Property in July 2003 to Schlossberg and Laliberte was tantamount to actual fraud. Accordingly, the Court finds that the Trustee established by both clear and convincing evidence and by a preponderance of the evidence that the Debtor's transfer of the Union Court Property to Schlossberg constituted actual fraud under § 160/5(a)(1) of the UFTA.

The June 8, 2005 resale of the Union Court Property to Carlos netted proceeds in the amount of approximately $200,000. (Trustee Ex. No. 31.) Those proceeds ultimately were distributed as follows: $18,435.46 to Christine; $53,000 to Laliberte as repayment for his loan obtained to close the deal; $76,207 to Carlos; and $52,357.54 to Schlossberg and Laliberte. The $52,357.54 Schlossberg and Laliberte received should have been paid to the Debtor as a result of his additional equity in the Union Court Property, Schlossberg and Laliberte profited on the resale to Carlos even though they were entitled to receive the "spread," i.e., the difference between the Debtor's rental payments and their mortgage obligation. There was no

evidence in the record to show that Schlossberg and Laliberte gave the Debtor equivalent value for the $52,357.54 in proceeds they received from the resale to Carlos.

Because the Court determined that the transfer of the Union Court Property from the Debtor to Schlossberg was a fraudulent conveyance under § 160/5(a)(1), the Trustee may recover the Union Court Property or the value thereof pursuant to § 160/9(b) from Schlossberg. The evidence demonstrated that Schlossberg benefitted from the Debtor's $120,000 investment in the Union Court Property. Hence, the Trustee may recover this sum from Schlossberg for the benefit of the Debtor's estate. Additionally, the evidence showed that Schlossberg and Laliberte received $52,357.54 from the proceeds of the resale of the Union Court Property to Carlos. The Trustee may also recover this amount from Schlossberg for the benefit of the Debtor's estate.

In sum, the Court finds that the Trustee has demonstrated that the transfer of the Debtor's interest in the Union Court Property to Schlossberg constituted actual fraud under § 160/5(a)(1) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sums of $120,000 for the first transfer of the Union Court Property and $52,357.54 for the second transfer of the Property, which represent the value of the Debtor's interest in the Union Court Property.

6. **Whether the Transfer of the Union Court Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/5(a)(2)**

Next, the Court will address the Trustee's claim that the transfer of the

Debtor's interest in the Union Court Property to Schlossberg constituted constructive fraud pursuant to § 160/5(a)(2) of the UFTA. The Court finds that the Trustee has shown all of the elements to establish a constructively fraudulent transfer. First, the Court finds that the Debtor made a voluntary transfer of his interest in the Union Court Property to Schlossberg and Laliberte. Next, at the time of the transfer, the Debtor had incurred obligations elsewhere. As the Court noted *supra*, the Debtor experienced insolvency as far back as 2003, (Trustee Ex. No. 50, Amended Statement of Financial Affairs.) The Debtor's company, Platinum, owed payroll taxes in the sum of $140,000 to the Internal Revenue Service for the period of 2003–2004. (Trustee Ex. No. 50, Amended Schedule E.) In addition, he owed child support to Christine in the sum of $120,000 for the period 2000–2005. (*Id.*) The Debtor also Owed "941 estimated taxes" in the amount of $250,000 for the period 2002–2004. (*Id.*) Hence, the Debtor had incurred obligations elsewhere at the time of the transfer of the Union Court Property to Schlossberg.

Further, the Court found *supra* that the Debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer. Finally, the Court finds that after the transfer, the Debtor failed to retain sufficient property to pay his indebtedness. The Debtor's February 2004 e-mail correspondence to Schlossberg indicated that he did not have any asset to pay his creditors. (Trustee Ex. No. 23.) In short, the Court finds that the Trustee demonstrated all of the requisite elements to establish a constructively fraudulent transfer.

Accordingly, the Court finds that the Trustee has demonstrated that the transfer of the Debtor's interest in the Union Court Property to Schlossberg constituted constructive fraud under § 160/5(a)(2) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sums of $120,000 and $52,357.54, which represent the Debtor's interest in the Union Court Property.

### 7. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/6(a)

The Court finds that the Trustee has demonstrated all of the requisite elements to sustain a cause of action against Schlossberg under § 160/6(a) of the UFTA. First, the Trustee established that creditors' claims arose before the transfer of the Union Court Property. Specifically, the Debtor's Amended Schedule F shows unsecured debt in excess of $848,000. (Trustee Ex. No. 50, Amended Schedule F.) Many of those debts were incurred several years prior to the transfer of the Union Court Property. (*Id.*) Second, the Trustee established that a transfer was made of the Debtor's interest in the Union Court Property to Schlossberg. Third, as discussed *supra*, the Trustee demonstrated that the transfer was made without the Debtor receiving a reasonably equivalent value in exchange for the transfer. Finally, the Court determined previously that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.

Thus, the Trustee has established all of the elements necessary to sustain a cause of action against Schlossberg under § 160/6(a) of the UFTA. Pursuant to § 160/9(b), the Court enters judgment against Schlossberg in the sums of $120,000 and $52,357.54 and in favor of the Trustee. The transfer of the Union Court

Property is avoidable under § 544(b)(1) and $160/8(a)(1). Under § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sums of $120,000 and $52,357.54, which represent the Debtor's interest in the Union Court Property.

### 8. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/6(b)

■ Finally, the Court must determine whether the Trustee has established all of the necessary elements to sustain a cause of action against Schlossberg under § 160/6(b) of the UFTA. This cause of action must be filed within one year after the transfer was made. 740 ILL. COMP. STAT. 160/10(c). The Court finds that the Trustee failed to file this cause of action within one year after the transfer was made. The Union Court Property was initially transferred to Schlossberg and Laliberte in July of 2003. Thereafter, they transferred it to Carlos in June of 2005. The Trustee filed the instant adversary proceeding in 2007, which is more than one year after the transfer was made. Therefore, the Trustee may not sustain a cause of action against Schlossberg under § 160/6(b) of the UFTA.

### C. Count III: 11 U.S.C. §§ 548(a) and 550(a)

Under Count III of the amended complaint, the Trustee alleges that within two years of the filing of his bankruptcy petition, the Debtor transferred the Union Court Property to Laliberte with the actual intent to delay, hinder, and defraud his creditors. The Trustee asserts that the February 10, 2004 e-mail correspondence from the Debtor to Schlossberg indicates that the Debtor entered into the Union

Court Property transaction in order to transfer his interest therein with the actual intent to hinder and defraud his creditors. The Debtor allegedly retained possession and control of the Union Court Property while concealing his real interest in that asset. According to the Trustee, the transfer of the Union Court Property constituted a conveyance of substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of his debts exceeded all of his assets. The Trustee seeks a finding that the transfer of the Union Court Property from the Debtor to Laliberte was fraudulent under 11 U.S.C § 548(a)(1)(A), (a)(1)(B)(ii)(I), (a)(1)(B)(ii)(III), and (a)(1)(B)(ii)(IV). In addition, the Trustee seeks to avoid the transfer of that property. Further, he requests the return of this estate asset or, in the alternative, a judgment in his favor for the benefit of the estate equal to the value of the property transferred pursuant to 11 U.S.C. § 550.

For the same reasons articulated with respect to Schlossberg under Count I of the amended complaint, the Court finds that the July 2003 transfer of the Union Court Property to Laliberte was not made within two years prior to the Debtor's bankruptcy filing. The Debtor filed a bankruptcy petition in October of 2005, which is twenty-seven months after the July 2003 transfer of the Union Court Property. Thus, the Trustee may not sustain a cause of action against Laliberte under § 548(a)(1)(A) or (B) because the transfer was not within the two years before the date of the bankruptcy filing. Therefore, the Court grants judgment in favor of Laliberte under Count III of the amended complaint.

### D. Count IV: 740 ILL. COMP. STAT. 160/5 and 160/6 and 11 U.S.C. § 544

Pursuant to Count IV of the amended complaint, the Trustee alleges that within

four years of the date of the filing of his bankruptcy case, the Debtor transferred a valuable asset, namely, the Union Court Property, to Laliberte with actual intent to delay, hinder, and defraud his creditors to whom he was either indebted or became indebted shortly thereafter. The Trustee avers that in the February 10, 2004 e-mail correspondence to Schlossberg, the Debtor admitted that he transferred his interest in the Union Court Property with the actual intent to hinder and defraud his creditors. Further, the Trustee contends that the transfer to Laliberte conveyed substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of this debts exceeded all of his assets. According to the Trustee, the Debtor retained possession and control of the Union Court Property while he concealed his real interest in this asset. The Trustee contends that the transfer of the Union Court Property to Laliberte was fraudulent under §§ 160/5 and 160/6 of the UFTA and should be avoided under § 544(b) to the extent necessary to satisfy the claims against the Debtor's estate pursuant to § 160/8.

For the same reasons set forth *supra* with respect to Schlossberg under Count II of the amended complaint, the Court finds that the transfer of the Union Court Property to Laliberte was both actually and constructively fraudulent under §§ 160/5(a)(1) and (2) and 160/6(a) of the UFTA. The Court must elaborate on two points with respect to Laliberte. First, the Court finds that the Debtor and Laliberte had a special relationship. Laliberte testified that he knew the Debtor prior to the Union Court Property transaction because they did business together. Laliberte stated that he sold packing to the Debtor for his company, Platinum. Second, for the same reasons articulated with respect to Schlossberg, the Court finds that Laliberte was an insider of the Debtor by virtue of the agreement between Schlossberg, Laliberte, and the Debtor, whereby Schlossberg and Laliberte purchased the Union Court Property with the intention of selling it back to the Debtor at a later date.

Thus, the Court finds that the transfer of the Union Court Property to Laliberte was both actually and constructively fraudulent under §§ 160/5(a)(1) and (2) and 160/6(a) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 160/9(b), the Trustee may recover the Debtor's interest in the Union Court Property from Laliberte or the value thereof for the benefit of the Debtor's estate. The Court awards judgment in the sums of $120,000 and $52,357.54 to the Trustee and against Laliberte, the entity for whose benefit the transfer was made.

### E. Count V: 11 U.S.C. §§ 548(a) and 550(a)

Under Count V of the amended complaint, the Trustee alleges that within two years of the date of the Debtor's bankruptcy filing, he transferred a valuable asset in the form of large shares of his equity in the Union Court Property out of his possession and into the possession of Carlos with the actual intent to delay, hinder, and defraud his creditors to whom he was either indebted or became indebted shortly thereafter. According to the Trustee, the transfer of the Union Court Property to Carlos conveyed substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of his debts then exceeded all of his assets at a fair valuation. The Trustee alleges that in spite of this transfer to Carlos, the Debtor retained possession and control of the Union Court. Property while concealing his real interest in that asset. The Trustee seeks a finding that

the transfer of the Debtor's interest in the Union Court Property to Carlos was fraudulent under § 548(a)(1)(A), (a)(1)(B)(ii)(I), (a)(1)(B)(ii)(III), and (a)(1)(B)(ii)(IV). In addition, the Trustee seeks to avoid the transfer of that Property. Further, he requests the return of this asset or, in the alternative, a judgment in his favor for the benefit of the estate equal to the value of the property transferred pursuant to § 550.

### 1. Whether the Transfer of the Union Court Property Was Fraudulent Under § 548(a)(1)(A)

■ First, the Court will address the Trustee's claim that the transfer of the Union Court Property by Schlossberg and Laliberte to Carlos constituted fraud in fact or actual fraud pursuant to § 548(a)(1)(A). There was no direct evidence that the transfer of the Debtor's interest in the Union Court Property by Schlossberg and Laliberte to Carlos was made with actual intent to hinder, delay, or defraud the Debtor's creditors. In February of 2004, over one year prior to the June 2005 transfer of the Union Court Property to Carlos, the Debtor wrote in an e-mail correspondence to Schlossberg that the articles of assignment for deed between the Debtor, Schlossberg, and Laliberte was a "great way" to protect his assets from his creditors. (Trustee Ex. No. 23.) The Trustee argues that this document demonstrates the Debtor's intent to hinder, delay, and defraud his creditors with respect to this June 2005 transfer to Carlos, Unfortunately, for the Trustee, while this e-mail correspondence shows the Debtor's intent to keep his assets from his creditors, it does not speak dispositively to the Debtor's intent at the time of the transfer over one year later. While this document constitutes strong evidence of the Debtor's overall scheme to hinder, delay, and defraud his creditors,

the Court must also turn to the badges of fraud to determine whether the transfer was intended to harm the Debtor's creditors.

First, there was no evidence of the Debtor absconding with proceeds of the transfer because there were no proceeds. Rather, with the Debtor's knowledge and consent, Schlossberg and Laliberte transferred the Debtor's equity interest in the Union Court Property to Carlos and the Debtor retained possession and control of that Property. Next, there was no consideration given for the transfer of the Union Court Property. After the Debtor's initial transfer of the Union Court Property to Schlossberg and Laliberte, the Debtor consistently fell behind in his payments to them. The parties eventually agreed that the articles of agreement for deed arrangement was not working. The Debtor found a substitute strawman for the Union Court Property—Carlos.

The documents at the June 8, 2005 closing on the sale from Schlossberg and Laliberte to Carlos indicated that the net proceeds of the sale equaled approximately $200,000, which included a transfer of $76,207 to Carlos, who did not have any funds of his own to purchase the Union Court Property. All of the money received by Carlos came directly out of the equity owing to the Debtor at the time of the sale of the Union Court Property. (Trustee Ex. No. 62 at 77:9–77:23.) However, the Debtor did not receive anything equivalent in value in exchange for transferring to Carlos his interest in the $76,207. Moreover, Schlossberg, Laliberte, and Christine also received payments out of the equity to which the Debtor was entitled pursuant to the Debtor's arrangement with the three of them. (Trustee Ex. No. 65 at 158:12–159:17.)

Prior to the June 8, 2005 transfer of the Union Court Property from Schlossberg and Laliberte to Carlos, the Debtor assigned his $200,000 interest in the Union Court Property to Christine in consideration for alleged outstanding child support payments. As a result, the Debtor received nothing in value from Christine in exchange for the transfer of his equity interest in the Union Court Property to her. On June 8, 2005, at the Debtor's direction, Christine then signed a release of option contract between herself and Schlossberg and Laliberte to free the title of the Union Court Property for sale.

Thus, the net effect of the Debtor's transactions is such that he masterminded the purchase and resale of the Union Court Property to two sets of strawmen who shielded this asset from the Debtor's creditors. This distribution of his equity through the previously detailed payments to Schlossberg, Laliberte, Carlos, and Christine was without consideration paid by them to him for his equity in the Union Court Property. In the meantime, the Debtor remained in possession of the Union Court Property from the June 2005 closing until he once again stopped making his rent/mortgage payments to Carlos and moved out of the Union Court Property in the fall of 2005. Hence, mere was a huge disparity in value between the property he transferred and the consideration received from them.

Further, Carlos, the transferee of the Union Court Property, was not an officer, agent, or creditor of an officer of a corporate transferor. Indeed, there was no special relationship between Schlossberg, Laliberte, and Carlos. Laliberte testified that he never met Carlos prior to the closing date. Finally, as discussed *supra,* the Debtor was balance-sheet insolvent when the transfer of the Union Court Property was made to Carlos in June of 2005, or he was rendered insolvent thereby.

In sum, four out of the six badges of fraud have been shown. Thus, the Court finds this is a sufficient number to infer actual fraud by the Debtor. Therefore, the Court finds that the Trustee has established by both clear and convincing evidence and by a preponderance of the evidence that the transfer of the Debtor's interest in the Union Court Property by Schlossberg and Laliberte to Carlos constituted actual fraud under § 548(a)(1)(A).

## 2. Whether the Transfer of the Union Court Property Was Fraudulent Under § 548(a)(1)(B)

Next, the Court will address whether the transfer of the Union Court Property to Carlos was constructively fraudulent. In short, the Court finds that the Trustee demonstrated all of the requisite elements to establish a constructively fraudulent transfer.

First, the Court finds that Schlossberg and Laliberte made a transfer of the Debtor's continuing equity interest in the Union Court Property to Carlos. Next, the transfer was made on June 8, 2005, approximately four months prior to the Debtor's bankruptcy filing in October of 2005. Moreover, the Court found *supra* that the Debtor was insolvent when the transfer was made or was rendered insolvent thereby. Furthermore, as the Court already noted, after the transfer of the Debtor's interest in the Union Court Property to Carlos, the Debtor had already incurred debts that would be beyond his ability to pay as they matured. The Debtor's Schedules show that his monthly income at the time of his bankruptcy filing was $5,600 and his monthly expenses totaled $13,102. (Trustee Ex. No. 50, Amended Schedules 1 & J.) Further, the Debtor's unsecured debts totaled approximately

$848,000 and his assets totaled $15,600. (*Id.* Amended Schedules F & B.) The Debtor's expenses far exceeded his income, and his assets were substantially less than his liabilities. Thus, the Court infers that after the transfer, the Debtor must have known that he would continue to incur debts beyond his ability to pay them as they matured.

Lastly, the Court must determine whether the Debtor received consideration from Carlos that had a value that was reasonably equivalent to the value of the Union Court Property. The Court finds that based on the evidence adduced at trial, the Debtor did not receive a reasonably equivalent value for the transfer of his interest in the Union Court Property to Carlos. The Court will examine the factors utilized to make this determination. *See Barber,* 129 F.3d at 387.

As previously discussed, the net proceeds of the resale of the Union Court Property were $200,000. Moreover, the Court also found *supra* that on the resale of the Union Court Property to Carlos, Carlos received $76,207 of the Debtor's additional equity in the Property. The Debtor did not receive any of the proceeds from the resale of the Union Court Property to Carlos. Thus, the Court finds that the Debtor did not receive a reasonably equivalent value for the transfer of his equity interest in the Union Court Property to Carlos.

Additionally, the Court finds that the transaction did not take place at arm's length, Carlos purchased the Union Court Property without using any funds of his own. Indeed, Carlos received a windfall of $76,207 of the Debtor's equity in the Union Court Property. Further, the Court finds that the fact that Carlos purchased the Union Court Property without any funds of his own demonstrates a lack of good faith on his part. After all, Carlos

admitted at trial that he thought the deal was too good to be true. Based on these factors, the Court concludes that the consideration that the Debtor received from Carlos did not have a value that was reasonably equivalent to the value of the Debtor's equity interest in the Union Court Property.

In sum, the Court finds that the Trustee has met all of the elements to establish that the transfer of the Debtor's interest in the Union Court Property by Schlossberg and Laliberte to Carlos was constructively fraudulent under § 548(a)(1)(B). Thus, the Trustee may avoid the transfer of the Union Court Property by Schlossberg and Laliberte to Carlos.

### 3. Recovery Under 11 U.S.C. § 550(a)

 The Trustee seeks an order under § 550(a) allowing him to recover the Union Court Property from Carlos or, in the alternative, entering a judgment in favor of the Trustee for the benefit of the Debtor's estate equal to the value of the Debtor's interest in the transferred asset. The Trustee alleges in the amended complaint that Carlos was an initial, immediate, or mediate transferee of the Union Court Property.

The Court finds that Carlos was not the initial transferee of the Union Court Property. Rather, Schlossberg and Laliberte were the initial transferees of the Property when it was first sold on July 23, 2003 because they had dominion over and control of the Union Court Property. *See Bonded Fin.,* 838 F.2d at 893. The subsequent June 8, 2005 transfer of the Debtor's interest in the Union Court Property by Schlossberg and Laliberte to Carlos makes Carlos an immediate or mediate transferee of the initial transferees. Under § 550(a)(2), an immediate or mediate transferee is "one who takes in a later transfer down the chain of title or posses-

sion." *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 722 (6th Cir.1992). The Court finds that Carlos was the immediate or mediate transferee of Schlossberg and Laliberte, the initial transferees. Title to the Union Court Property was transferred to Carlos in June of 2005 after the Debtor transferred his interest in that asset to Schlossberg and Laliberte in July of 2003.

 Accordingly, the Court grants judgment in favor of the Trustee and against Carlos under Count V of the amended complaint. The Court finds that the transfer of the Debtor's interest in the Union Court Property from Schlossberg and Laliberte to Carlos was a fraudulent conveyance under § 548(a)(1)(A) and (B). As such, the transfer is avoidable under § 544(b)(1). Pursuant to § 550(a)(2), the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the sale of the Union Court Property.

### F. Count VI: 740 Ill. Comp. Stat. 160/5 and 160/6 and 11 U.S.C. § 544

 Lastly, under Count VI of the amended complaint, the Trustee alleges that within four years of the date of the filing of his bankruptcy case, the Debtor transferred a valuable asset in the form of large shares of his equity in the Union Court Property to Carlos with actual intent to delay, hinder, and defraud his creditors to whom he was either indebted or became indebted shortly thereafter. The Trustee avers that the transfer to Carlos conveyed substantially all of the Debtor's valuable assets, and as a result, the Debtor became insolvent because the sum of his debts exceeded all of his assets. According to the Trustee, the Debtor retained

possession and control of the Union Court Property while he concealed his real interest in this asset. The Trustee contends that the transfer of the Union Court Property to Carlos was fraudulent under §§ 160/5 and 160/6 of the UFTA and should be avoided under § 544 to the extent necessary to satisfy the claims against the Debtor's estate pursuant to § 160/8.

### 1. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 Ill. Comp. Stat. 160/5(a)(1)

First, the Court will address the Trustee's claim that the transfer of the Debtor's interest in the Union Court Property to Carlos constituted fraud in fact or actual fraud pursuant to § 160/5(a)(1) of the UFTA. There was no direct evidence of the Debtor's intent at the time of the transfer of the Union Court Property to Carlos on June 8, 2005. However, in a February 2004 e-mail correspondence to Schlossberg, the Debtor acknowledged his intent to protect his assets from his creditors. (Trustee Ex. No. 23.) The Court finds that this transaction constitutes yet another attempt by the Debtor to protect and hide his assets from his creditors. The transfer was effectuated by Schlossberg and Laliberte, strawmen, to another strawman, Carlos. Unfortunately for the Trustee, however, this e-mail correspondence in and of itself does not demonstrate actual fraud at the time of the June 2005 transfer of the Union Court Property to Carlos.

Because there is rarely direct evidence of the intent underlying a transfer of property, courts look to circumstantial evidence in determining whether a transfer was intended to hinder, delay, or defraud creditors. At this point, it is helpful to analyze the evidence in terms of the eleven

"badges of fraud," many of which are present in this matter,

First, the Debtor did retain possession of the Union Court Property after the transfer. He resided in the Property with Christine and their children until the fall of 2005 when he could no longer make the mortgage/rent payment to Carlos. Next, the transfer was recorded, but the side agreements whereby Christine received proceeds from the sale and turned them over to Laliberte and Carlos were concealed. In this deal, the initial straw buyers, Schlossberg and Laliberte, sold the Union Court Property to another straw buyer, Carlos, in order to shield the Debtor's equity therein from his creditors. Further, evidence was adduced to show that at the time of the transfer, the Debtor and his company, Platinum, were involved in litigation with AgriStar. Several judgments had been entered against the Debtor as evidenced by his Schedules. One of those judgments was the result of PACA litigation, for which the Debtor was potentially personally liable. Moreover, the transfer occurred shortly before or shortly after substantial debt was incurred by the Debtor. In addition, Schlossberg and Laliberte's transfer of the Debtor's equity interest in the Union Court Property to Carlos amounted to substantially all of the Debtor's assets. The Debtor's Schedules show that he did not own any real property approximately four months after the transfer, and he listed personal property valued at $15,600. (Trustee Ex. No. 50, Amended Schedules A & B.)

The transfer of the Union Court Property on June 8, 2005 was made by Schlossberg and Laliberte, business associates and partners of the Debtor, to Carlos. The Debtor testified that he met Carlos prior to this transaction when he was working for MidAmerica Bank as a loan officer. The Debtor went to Carlos' real estate office in order to solicit business from him. It is undisputed that Carlos was neither a relative nor a partner of the Debtor. Thus, the Court finds that Carlos was not an insider of the Debtor, and the transfer by Schlossberg and Laliberte to Carlos was not to an insider.

Further, the Court previously determined that the Debtor was insolvent at the time or became insolvent shortly after the transfer was made. The Debtor removed and concealed assets and even admitted to forging Christine's name to documents. Lastly, the Court also found that the value of the consideration received by the Debtor was not reasonably equivalent to the value of the Debtor's interest in the Union Court Property.

In short, it appears that most of the badges of fraud are present here. Therefore, the Court finds that the Trustee has demonstrated that the transfer of the Debtor's equity interest in the Union Court Properly by Schlossberg and Laliberte to Carlos was made with actual intent to hinder, delay, or defraud the Debtor's creditors. Because § 548 of the Code and § 160/5 of the UFTA are analogous, the findings with respect to § 548(a)(1)(A) apply equally to the requirements of § 160/5(a)(1). *See Spatz,* 222 B.R. at 164; *Randy,* 189 B.R. at 443. Hence, for the same reasons articulated pursuant to § 548(a)(1)(A), the Court finds that the Trustee established that the transfer of the Debtor's equity interest in the Union Court Property by Schlossberg and Laliberte to Carlos constituted actual fraud under § 160/5(a)(1) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Under § 550(a)(2) and § 160/9(b)(2) of the UFTA, the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the Union Court Property.

### 2. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/5(a)(2)

Next, the Court must determine whether the transfer of the Debtor's interest in the Union Court Property to Carlos was constructively fraudulent under § 160/5(a)(2) of the UFTA. Under this alternate theory, the Trustee must show that Schlossberg and Laliberte made a transfer of the Debtor's interest in the Union Court Property to Carlos without the Debtor receiving a reasonably equivalent value in exchange for the transfer, and that the transfer rendered the Debtor insolvent.

The Court finds that the Trustee has met all of the elements to establish a cause of action against Carlos under § 160/5(a)(2). Because § 548 of the Code and § 160/5 of the UFTA are analogous, the findings made with respect to § 548(a)(1)(B) apply equally to the requirements of § 160/5(a)(2). *Id.* Thus, for the same reasons articulated *supra* with respect to § 548(a)(1)(B), the Court finds that the Trustee has demonstrated that the transfer of the Debtor's interest in the Union Court Property by Schlossberg and Laliberte to Carlos was constructively fraudulent under § 160/5(a)(2) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Under § 550(a)(2) and § 160/9(b)(2) of the UFTA, the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the Union Court Property.

### 3. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/6(a)

Next, the Court finds that the Trustee has demonstrated all of the requisite elements to sustain a cause of action against Carlos under § 160/6(a). First, the Trustee established that creditors' claims arose before the transfer by Schlossberg and Laliberte of the Debtor's interest in the Union Court Property to Carlos. Specifically, the Debtor's Amended Schedule F lists unsecured debt in excess of $848,000. (Trustee Ex. No. 50, Amended Schedule F.) Many of those debts were incurred by the Debtor several years prior to the transfer of the Union Court Properly in June of 2005. (*Id.*) Second, the Trustee established that a transfer was made by Schlossberg and Laliberte, strawmen of the Debtor, of the Debtor's interest in the Union Court Property. Third, as discussed *supra*, the Trustee demonstrated that Schlossberg and Laliberte made the transfer without the Debtor receiving a reasonably equivalent value in exchange for the transfer. Finally, the Court determined previously that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.

Therefore, the Trustee has established all of the element necessary to sustain a cause of action against Carlos under § 160/6(a) of the UFTA. The Court enters judgment against Carlos in the sum of $76,207 and in favor of the Trustee. The transfer of the Union Court Property by Schlossberg and Laliberte to Carlos is avoidable under § 544(b)(1) and § 160/8(a)(1). Under § 550(a)(2) and § 160/9(b)(2), the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the resale of the Union Court Property.

### 4. Whether the Transfer of the Union Court Property Was Fraudulent Under 740 ILL. COMP. STAT. 160/6(b)

Finally, the Court must determine whether the Trustee has established all of

the necessary elements to sustain a cause of action against Carlos under § 160/6(b) of the UFTA. This cause of action must be filed within one year after the transfer was made. 740 ILL. COMP. STAT. 160/10(c). The Court finds that the Trustee failed to file this adversary proceeding within one year after the transfer of the Union Court Property was made to Carlos. The Union Court Property was transferred to Carlos by Schlossberg and Laliberte in June of 2005. The Trustee filed the instant adversary proceeding in 2007, which is more than one year after the transfer was made. Therefore, the Trustee may not sustain a cause of action against Carlos under § 160/6(b) of the UFTA.

## IV. *CONCLUSION*

For the foregoing reasons, the Court grants judgment in favor of the Trustee and against Schlossberg under Count I of the amended complaint. The Court finds the transfer of the Debtor's interest in the Tunbridge Properly to Schlossberg was a fraudulent conveyance under § 548(a)(1)(A) and (B). As such, the transfer is avoidable under § 544(b)(1). Under § 550(a)(1), the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sum of $109,000 for the fraudulent transfer of the Tunbridge Property, which represents the value of the Debtor's interest in that Property received by Schlossberg.

In addition, the Court grants judgment in favor of the Trustee and against Schlossberg pursuant to Count 11 of the amended complaint. The Court finds that the transfers of the Debtor's interests in the Union Court Property and the Tunbridge Property to Schlossberg were fraudulent conveyances under §§ 160/5(a)(1) and (2) and 160/6(a) of the UFTA. As such, the transfers are avoidable under § 544(b)(1) and § 160/8(a)(1).

Pursuant to § 550(a)(1) and § 160/9(b) of the UFTA, the Trustee may recover from Schlossberg, for the benefit of the Debtor's estate, the sums of $120,000 and $52,357.54, which represent the value of the Debtor's interest in the Union Court Property, and $109,000, which represents the value of the Debtor's interest in the Tunbridge Property received by Schlossberg. Under § 550(d), the Trustee is limited to only a single satisfaction from Schlossberg pursuant to Counts I and II of the amended complaint.

With respect to Count III of the amended complaint, the Court grants judgment in favor of Laliberte and against the Trustee. The Court finds that the transfer of the Debtor's interest in the Union Court Property to Laliberte was outside the two-year period under § 548(a)(1)(A) and (B).

Under Count IV of the amended complaint, the Court grants judgment in favor of the Trustee and against Laliberte. The Court finds that the transfer of the Debtor's interest in the Union Court Property was a fraudulent conveyance under §§ 160/5(a)(1) and (2) and 160/6(a) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to § 550(a)(1) and § 16079(b) of the UFTA, the Trustee may recover from Laliberte, for the benefit of the Debtor's estate, the sums of $120,000 and $52,357.54, which represent the value of the Debtor's interest in the Union Court Property received by Laliberte.

With respect to Count V of the amended complaint, the Court enters judgment in favor of the Trustee and against Carlos. The Court finds that the transfer of the Debtor's interest in the Union Court Property to Carlos was a fraudulent conveyance under § 548(a)(1)(A) and (B). As such, the transfer is avoidable under

§ 544(b)(1). Pursuant to § 550(a)(2), the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the sale of the Union Court Property.

Finally, the Court grants judgment in favor of the Trustee and against Carlos pursuant to Count VI of the amended complaint. The Court finds that the transfer of the Union Court Property to Carlos was a fraudulent conveyance under §§ 160/5(a)(1) and (2) and 160/6(a) of the UFTA. As such, the transfer is avoidable under § 544(b)(1) and § 160/8(a)(1). Pursuant to $550(a)(2) and § 160/9(b)(2) of the UFTA, the Trustee may recover from Carlos, for the benefit of the Debtor's estate, the sum of $76,207, which represents the value of the Debtor's interest in the proceeds distributed to Carlos from the sale of the Union Court Property. Under $550(d), the Trustee is entitled to only a single satisfaction from Carlos pursuant to Counts V and VI of the amended complaint.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.